# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
ALEXANDER RODRIGUEZ,                     :
                                         :
              Petitioner,                :        Civ. No. 18-10598 (RBK)
                                         :
     v.                                  :
                                         :
UNITED STATES OF AMERICA,                :
                                         :        **OPINION**
                                         :
              Respondent.                :
_____  :

KUGLER, United States District Judge:

     Before the Court is Petitioner, Alexander Rodriguez's motion to vacate, set aside, or correct

sentence, pursuant to 28 U.S.C. § 2255.  Respondent filed an Answer opposing relief (ECF No.

13), and Petitioner filed a reply, (ECF No. 15).  Additionally, after the Court appointed counsel

for Petitioner, the parties submitted supplemental briefing. (ECF Nos. 36, 37.)  For the reasons

discussed below, the Court will deny the § 2255 motion and will not issue a certificate of

appealability.

## I.      BACKGROUND

     This case arises from Petitioner's involvement in a conspiracy to distribute and to possess

with intent to distribute methamphetamine from on or about April 1, 2012, through April 28, 2012,

in violation of 21 U.S.C. § 846, and contrary to 21 U.S.C. § 841(b)(1)*(A)*. *United States v.

Rodriguez*, 726 F. App'x 136, 138 (3d Cir. 2018). The Third Circuit set forth the underlying

circumstances of this case on direct appeal, as follows:

> The charge arose from Rodriguez's participation in the sale of four
> pounds of methamphetamine to a group of buyers, and his role in
> assisting the buyers to dilute the drugs for subsequent resale. The
> evidence admitted at trial established that Rodriguez arranged with
> his friend, David Santos, to supply methamphetamine to a group of

> three buyers: Kate Rodriguez, Joel Rodriguez, and David
> Crespo. Rodriguez brokered a deal between the buyers and Santos,
> whereby Kate, Joel, and Crespo agreed to pay $100,000.00 in
> exchange for four pounds of methamphetamine. Santos acquired the
> drugs from a connection he had identified only as 'Juko,' and
> realized a $10,000.00 profit from the sale, half of which he gave to
> Rodriguez. The sale took place on the evening of April 17, 2012 at
> Santos's house; Rodriguez met with Kate and Joel beforehand, took
> them to Santos's house, and left with them after the deal was
> completed. Rodriguez also met with Joel for several hours the next
> day, April 18, 2012, to dilute one pound of the methamphetamine
> into five diluted pounds. Rodriguez took possession of the
> remaining undiluted methamphetamine, while Joel kept the five
> diluted pounds of drugs to take to Florida to sell with Kate.

*Id*. Unlike his co-conspirators, who each pleaded guilty, Petitioner chose to proceed to trial.

On January 23, 2015, prior to trial, the Government filed a letter requesting that the Court conduct a hearing pursuant to *Missouri v. Frye*, 132 S. Ct. 1399 (2012), to inquire into whether trial counsel advised Petitioner of the Government's plea offer. As set forth in the plea offer, the Government formally extended an offer to Petitioner on March 24, 2014. (ECF No. 13-2.) The offer initially expired on April 18, 2014, as Petitioner did not accept it, but the Government renewed the offer before the *Frye* hearing. (ECF No. 13, at 5.)

Under the plea offer, the Government would have accepted a guilty plea from Petitioner to conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 846, contrary to 21 U.S.C. § 841(b)(1)*(C)*. (ECF No. 13-2) Unlike the indictment, which charged Petitioner to conspiracy contrary to § 841(b)(1)*(A)*, the charge in the plea offer did not carry a statutory mandatory minimum sentence. (*Compare* 21 U.S.C. § 841(b)(1)(A), *with* 28 U.S.C. § 841(b)(1)(C).) Additionally, the plea offer stipulated as to the advisory Guidelines sentencing range in two

different scenarios, in light of proposed changes[1] to the Guidelines, which would later reduce the base offense level for the offense by 2 levels, from a 34 to a 32. (ECF No. 13-2, at 7–8.)

Although the United States Sentencing Commission had not yet adopted the proposed amendment, in the first scenario, the Government would not oppose a downward variance of two levels, resulting in a total Guidelines offense level of 29 if the Court granted the variance. (*Id.* (accounting for a 3-level reduction for acceptance of responsibility).)  Under the second scenario, if the Court rejected the variance, Petitioner's total Guidelines offense level would have been a 31 under the plea offer. (*Id.*)

On February 6, 2015, the Court conducted a *Frye* hearing.  At the hearing, the Court engaged in the following conversation with Petitioner's trial counsel, Mr. Wayne Powell:

> COURT: . . . Apparently there was a plea agreement, proposed plea agreement letter dated March 24, 2014 which was sent to you. Is that correct?
>
> MR. POWELL: It was, Judge, that's correct.
>
> THE COURT: You received that?
>
> MR. POWELL: I did receive it.
>
> THE COURT: Okay. Did you provide a copy to your client?
>
> MR. POWELL: I did not provide a physical copy to Mr. Rodriguez. What I had him do, Judge, was when Mr. Smith [referring to Matthew Smith, the prior Assistant U.S. Attorney on the case when the Plea Offer was made] sent me the agreement, I had him come to my office. We reviewed the offer in my office, and I had discussions with him about whether or not he was interested in the plea offer at that time.
>
> THE COURT: *So you went over all the details of the plea offer with him at that time?*

---

[1] The United States Sentencing Commission eventually adopted the changes after Petitioner rejected the plea offer.

MR. POWELL: *Every single page, every single word.*

THE COURT: All right. And I assume he rejected the plea offer.

MR. POWELL: He did, Judge. And I'll indicate to -- for the Court's edification, Judge, that at the time that Mr. Smith made the original offer, there was some discussions between myself and the U. S. Attorney's Office about the subsequent offer because the government at that time had some concern about two things. One, there was some pending changes in the Federal Sentencing Guidelines respecting narcotics offenses which the prosecutor believed might allow the government to make a more favorable offer to Mr. Rodriguez and also at that time, there were no agreements from any of the co-defendants.

So that the Government's position with respect to the quality of the proofs I believe at the time was somewhat different than it is today. You know, Mr. Smith never did send to me, Judge, a plea offer in this case and then ultimately as your Honor knows, the case was transferred to the U.S. Attorneys who are present here in the courtroom. Of course, we haven't had any offers from them other than a, an indication that the original offer made by Mr. Smith back in March of 2014 was still available to the defendant.

(ECF No. 13-3, 2:18 to 4:5 (emphasis added).)  Following that conversation, the Court swore in

Petitioner, and engaged in the following colloquy:

Q. I want to ask you about the plea agreement, which by the way, I know nothing about. I am not part of that process at all, and I don't want you to reveal any confidential conversations you had with Mr. Powell. Do you understand that?

A. Yes.

Q. I just want to make sure that you were aware that there was a plea agreement offer in a letter dated March 24th, 2014. You are aware of that?

A.  Yes.

Q. And did you discuss that with Mr. Powell?

A. Yes.

Q. Did you have enough time to talk to Mr. Powell about that plea agreement offer?

A. Yes.

Q. And do you understand, do you think you understood everything about that offer for a plea agreement?

A. Yes.

Q. All right, and obviously, it's your decision and your decision alone whether to plead guilty or go to trial. Your attorney can't make that decision for you. You understand that, don't you?

A. Yes.

Q. He can give you advice, but only you can make the decision whether to plead guilty or have a trial. Do you understand that?

A. Yes.

Q. Okay. And was it your decision to reject the plea agreement offer from the Government that was in that March 24th, 2014 letter?

A. Yes.

(*Id.* at 4:6 – 5:21). As Petitioner rejected the plea offer, he proceeded to trial where the proofs:

established that Rodriguez was present during two events relating to the conspiracy: first, the sale of the methamphetamine from Santos to Joel and Kate, which took place at Santos's house the evening of April 17, 2012, and second, the meeting between Joel and Rodriguez on April 18, 2012, during which they diluted the methamphetamine purchased the previous day.

. . . .

[t]here was sufficient evidence for the jury to conclude that Rodriguez, Santos, Joel, Kate, and Crespo were all members of a single conspiracy because they shared a common goal and were dependent upon each other's continuous cooperation for the success of the undertaking. It is clear that the conspirators, including Rodriguez, had a common goal to conduct a transaction involving the sale of four pounds of methamphetamine from Santos to Joel, Kate, and Crespo. . . . Santos was aware before the transaction that

5

> Rodriguez was acting as a middleman, arranging for buyers of his
> product, and Kate was aware in advance that Rodriguez was
> arranging for the purchase of the methamphetamine from another
> individual. It is also clear that the success of this venture was
> dependent upon the continuous cooperation of all the parties
> charged in the indictment: Santos only sought to obtain the drugs
> because Rodriguez knew that Kate, Joel, and Crespo were interested
> buyers, and the buyers' scheme to profit from the resale of the drugs
> could not have succeeded had Santos been unable to provide them.
> This cooperation culminated in the sale Rodriguez orchestrated on
> the evening of April 17, 2012, when Joel and Kate, using money
> provided by Crespo, purchased the methamphetamine from Santos.

*Rodriguez*, 726 F. App'x at 139, 143.

As a result, the jury returned a guilty verdict as to the single count of conspiracy to distribute and possess with intent to distribute more than 500 grams of methamphetamine. (*United States v. Rodriguez*, Crim. No. 13-428, ECF No. 85 (D.N.J.).)  Afterwards, the Court sentenced Petitioner to a term of 121 months in prison. (*Rodriguez*, Crim. No. 13-428, ECF No. 117.) Petitioner filed an appeal, and the Third Circuit affirmed.  *Rodriguez*, 726 F. App'x at 138.

In June of 2018, Petitioner filed a *pro se* motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, (ECF No. 1), and the Government filed an Answer opposing relief, (ECF No. 13).  The Court appointed counsel for Petitioner and held an evidentiary hearing on October 18, 2021, regarding Petitioner's claim that trial counsel misunderstood the plea offer and provided Petitioner with erroneous advice in connection with his sentencing exposure. (ECF No. 24.)  Afterwards, the parties submitted supplemental briefing.  (ECF Nos. 36, 37.)

## II.    STANDARD OF REVIEW

Under 28 U.S.C. § 2255, a motion to vacate, set aside or correct a sentence of a person in federal custody, entitles a prisoner to relief if "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise

subject to collateral attack." 28 U.S.C. § 2255(a).  When considering a § 2255 motion, a district court "must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record." *United States v. Tolliver*, 800 F.3d 138, 141 (3d Cir. 2015).  A district court must *sua sponte* hold a hearing on the motion "'if the files and records do not show conclusively that [the movant] was not entitled to relief.'" *Id.* (quoting *Solis v. United States*, 252 F.3d 289, 294 (3d Cir. 2001)).

### III.   DISCUSSION

In his Motion, Petitioner raises two claims of ineffective assistance of counsel.   Petitioner argues that counsel was ineffective for: (1) misinforming Petitioner about the difference in sentencing exposure between the plea offer and a conviction at trial, and (2) relying on an alibi defense, rather than obtain an expert chemist's report that would have provided exculpatory evidence. (ECF No. 1-2, at 13, 22–26.)

Generally, the Sixth Amendment provides that in "all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Cont. amend. VI. The Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).  To prevail on a claim of ineffective assistance of counsel, a petitioner must establish that: 1) counsel's performance was deficient, and 2) that the deficient performance prejudiced the petitioner. *See id.* at 687.

More specifically, the first prong of the test requires a petitioner to show "that counsel's representation fell below an objective standard of reasonableness." *Lafler v. Cooper*, 566 U.S. 163 (2012) (quoting *Hill v. Lockhart*, 474 U.S. 52, 57 (1985).  In evaluating whether counsel was deficient, "the proper standard for attorney performance is that of reasonably effective assistance."

7

*Strickland*, 466 U.S. at 687.  The Sixth Amendment requires a fair trial and reasonable competence, not some higher quality of legal representation. *See id.* at 688–89.  It does not require, "perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).

Thus, the standard is highly deferential, and courts must presume that counsel has "rendered adequate assistance" and to have used "reasonable professional judgment." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016).  In other words, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

The second prong of the *Strickland*, prejudice, requires a petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  "A reasonable probability is one 'sufficient to undermine confidence in the outcome.'" *Collins v. Sec. of Pennsylvania Dept. of Corr.*, 742 F.3d 528, 547 (3d Cir. 2014) (quoting *Strickland*, 466 U.S. at 694).

The "ultimate focus" of the prejudice inquiry is on the fundamental fairness of the proceeding. *Strickland*, 466 U.S. at 696.  A court must view prejudice "in light of the totality of the evidence at trial and the testimony at the collateral review hearing." *Collins*, 742 F.3d at 547.  A court need not address both components of the ineffective assistance inquiry. *Strickland*, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," or vice versa, courts should follow that course. *Id.*

### a. Ineffective Assistance of Counsel for Failing to Properly Advise Petitioner Regarding the Sentencing Exposure of his Plea Offer

First, Petitioner contends that counsel was ineffective for misinforming him of the "of the difference in sentencing exposure between [the] plea agreement and [a] loss at trial." (ECF No. 1, at 4.)  Under our jurisprudence, in order to be effective at the plea-bargaining stage, defense counsel must inform his client of formal plea offers. *Frye*, 566 U.S. at 145.  Defense counsel must also provide "enough information to make a reasonably informed decision [about] whether to accept a plea offer." *United States v. Bui*, 795 F.3d 363, 367 (3d Cir. 2015) (internal quotation marks omitted).  "Knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision [about] whether to plead guilty." *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992).  However, "an erroneous strategic prediction about the outcome of trial is not necessarily deficient performance." *See Lafler*, 566 U.S. at 174.

Additionally, even if a petitioner shows that counsel was deficient for failing to adequately inform him of the substance of a plea offer, the petitioner must also show prejudice. *See Strickland*, 466 U.S. at 687.  To demonstrate prejudice in this context, a petitioner must show that: (1) he would have accepted the plea offer had he received effective assistance of counsel; (2) there was a reasonable probability that the Government and the trial court would have accepted the plea; and (3) accepting the plea would have resulted in a lesser charge or a sentence of less prison time. *See Lafler*, 566 U.S. at 164; *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013).

With those principles in mind, this Court had conducted a *Frye* hearing to ensure that Petitioner was aware of the Government's formal plea offer and that he understood the terms of that offer.  At the *Frye* hearing, trial counsel advised the Court that he had gone over "[e]very

single page, every single word" of the plea agreement with Petitioner, and Petitioner testified that

he understood the agreement. (ECF No. 13-3, 2:18 to 5:21.)

In his § 2255 Motion, however, Petitioner alleged that trial counsel lied at the *Frye* hearing,

as the statement that counsel "'reviewed in his office . . . every single page[,] every single word,'

was simply not true." (ECF No. 1-2, at 3.)  "Rather than throw his attorney under the bus, who he

would be going to trial with, [Petitioner] sat silent while [his attorney] lied and . . . did not disclose

the fallacy to the Court." (*Id*.)  Further, trial counsel allegedly advised that the plea "offer was for

him to plead guilty to the charge and that the bottom line [was] that he would get 10 years." (ECF

No. 1-2, at 2 (internal quotation marks omitted).)  Trial counsel allegedly explained that because

of the mandatory minimum, the "plea could not go below '10 years,'" and that if he was convicted

at trial, Petitioner would receive "about 12 years." (*Id*.)  Based on that information, and "the slight

difference in the sentences," Petitioner "made his decision to reject the plea offer and proceed to

trial." (*Id*.)

Unlike the indictment, however, which charged Petitioner with conspiracy contrary to §

841(b)(1)*(A)*, the plea offer charged conspiracy under § 841(b)(1)*(C)*, which did not in fact carry

a mandatory minimum sentence. (ECF No. 13-2.)  As a result of this error, Plaintiff contends that

had he received correct advice, he would have accepted the plea offer, rather than proceed to trial.

(ECF No. 1-2, at 19–20.)  In support of these allegations, Petitioner obtained an affidavit from trial

counsel, in which counsel averred that he misunderstood the plea offer and provided Petitioner

with erroneous advice.  (ECF No. 16, at 8 (stating his "mistaken belief . . . that the plea offer

contained a ten (10) year minimum mandatory sentence").)

In light of these allegations, the Court held an evidentiary hearing.  At the hearing, trial

counsel confirmed that he was under the mistaken impression that Petitioner "was subject to the

10

mandatory minimum, which was a ten-year mandatory minimum," under the plea agreement. (ECF No. 32, at 10:9–14.)  Trial counsel also testified that he had erroneously explained the ten-year mandatory minimum to Petitioner on more than one occasion, including when Petitioner's family members were present. (*Id*. at 10:14–20.)  In particular, trial counsel stated:

> It was my belief that the mandatory minimum applied to what they were offering us at the time. As a matter of fact, a part of the reason for why, ultimately, the case went to trial was because it was my perception, and my indication to Mr. Rodriguez, that whether he pled guilty or not, if he was sentenced as the Government was offering, he would get at least ten years, so that, frankly, there was no downside to trying the case; that he was in just as good a position if he tried the case as if he took the offer, because if he lost, he'd get the mandatory minimum but if he'd plead, for sure he'd get the mandatory minimum.

(*Id*. at 10:24 to 11:9.)  Upon reviewing the plea agreement at the evidentiary hearing, trial counsel testified:

> It does appear that the count to which he would have pled does not have a mandatory minimum. But I have to tell you, I looked at that plea agreement 20 times prior to the time we hit trial and for reasons that I cannot fully explain, it was my belief, right up until the time we sat down to pick a jury, that he was subject to the mandatory minimum.

(*Id*. at 11:13–18.)  Throughout the hearing, trial counsel's responses were consistent on the point of his erroneous advice, his explanation for the mistakes was plausible, and he recounted specific details, such as the location and presence of family members, on the occasions he gave the erroneous advice.  In addition to that testimony, trial counsel's demeanor and conviction on the subject, lead the Court to conclude that counsel was credible on the point of his erroneous advice. As a result, this Court finds that trial counsel erroneously advised Petitioner regarding the plea offer's sentencing exposure.

Since accurate "[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer" is often crucial to the decision about whether to plead guilty, this Court holds that Petitioner has demonstrated that counsel was deficient at the plea-bargaining stage and that Petitioner satisfies the first *Strickland* prong. *Day*, 969 F.2d at 43.

As to the second prong, prejudice, the Court arrives at a different conclusion.  At the evidentiary hearing, Petitioner testified that he would have taken the Government's plea offer as follows:

> Q. Why? Why were you interested in entering into a plea agreement with the Government?
>
> A. Well, like I said before, I wanted the best option available for me for a better plea agreement because they had a lot of evidence against me.
>
> Q. All right. Mr. Rodriguez, if you had known that there was a plea agreement on the table with no mandatory minimum in it in March 2014, would you have taken it?
>
> A. Yes.
>
> Q. Why?
>
> A. Well, due to the guidelines that I think now from, you know, 29 with the two-point deduction, that drops it down to 87, so I figure that's a lot -- way less than a ten-year mandatory minimum sentence.
>
> Q. Were there any other reasons that you would have taken it?
>
> A. Yes, because I didn't -- I really, you know, at the time wanted to avoid going to trial because of the evidence they had against me of the people testifying.

(ECF No. 34, at 50:6 to 51:12.)  For the following reasons, the Court finds that Petitioner's testimony was not credible.

First, Petitioner's claims that he would have accepted the plea offer "cannot be reconciled with [his] steadfast protestations of innocence." *Blackman v. United States*, No. 12-2509, 2014

12

WL 1155444, at *3 (D.N.J. Mar. 21, 2014).  Throughout the underlying proceedings, Petitioner

has never admitted that he was guilty of any conspiracy charge, neither the one in the indictment,

nor the one within the plea offer.[2]  Moreover, Petitioner has not admitted guilt in his § 2255 Motion

or during the evidentiary hearing.

In fact, Petitioner vigorously proclaimed his innocence throughout these § 2255

proceedings.  For example, Petitioner stated the following, *under penalty of perjury*:

> [A]lthough the totality of the evidence painted him at most as a broker of a singular and relatively minor transaction wherein *he had neither knowledge nor intent to be involved in any distribution of methamphetamine.*
>
> (D.E. 15, at 13 (emphasis added).)
>
> [H]ad counsel reviewed the pleadings he would have determined that obtaining an expert chemist['s] report would provide exculpatory evidence of *actual innocence.*
>
> (D.E. 1-2, at 25–26 (emphasis added).)
>
> Counsel rendered ineffective assistance when he failed to investigate the facts, laws and circumstances and procure exculpatory evidence that would have established *Rodriguez was not in the 'conspiracy to distribute'* as charged.
>
> (*Id*. at 22 (emphasis added).)
>
> Rodriguez *was not . . . in the conspiracy to distribute* but only a broker of the deal between the buyer and seller.
>
> (*Id*. at 24 (emphasis added).)
>
> The testimony of one (1) witness, Joel, of the totality of evidence presented by the government, inadvertently, creates a window of time by which Rodriguez could have joined the conspiracy to distribute. . . .  This unintended window of time, with proper investigation by counsel, could have exposed the false testimony of

---

[2] Both 21 US.C. § 846(b)(1)(A) and § 846(b)(1)(C) have identical elements of the offense and only vary in their penalties based on the weight of the methamphetamine at issue.

Joel, and *established [that] Rodriguez did not join the conspiracy to distribute.*

(*Id*. at 25 (emphasis added).)

Joel's testimony—which Rodriguez maintains was false—was 'the sole evidence heightening Rodriguez's conduct to that of a conspiracy.'

(*Id*. at 21.)

Counsel was ineffective when he failed to investigate and pursue a lesser charge of facility by communication device when the overwhelming evidence demonstrated petitioner's role was at most that of broker *and that he had no intent to distribute or knowledge of distribution of the methamphetamine*."

(ECF No. 15, at 9 (emphasis added).)

"Santos, Kate, and Burch [the other Government witnesses involved in the drug deal] testified that Petitioner 'brokered' the deal and never once testified, suggested, or implied in any way that Petitioner had any knowledge, intent, or desire to distribute or conspire to distribute methamphetamine.

(*Id*. at 11.)

"Here, the Petitioner argues that his prior counsel should have pursued the acceptance of this charge [*i.e.*, facility by telephone/843] with the Government, the Court, and the Jury, as a separate and less serious crime, *at the most all that his client could be guilty of*."

(*Id*. at 11–12 (alteration in original) (emphasis added).)

[T]he evidence that Rodriguez procured himself (*i.e.*, chemist report) which in conjunction with the record of the government's evidence *would have established that he is not a conspirator as charged in the indictment*.

(ECF No. 23, at 2 (emphasis added).)

Despite these declarations of innocence, Petitioner would now have the Court believe that he would have pleaded guilty had he received proper advice. "Boiled down, his claim is that, with

proper advice, he would have entered *an untruthful plea of guilty*." *Blackman*, 2014 WL 1155444, at *3 (emphasis added).  That was never the offer, "the plea offer entailed an admission of guilt, not a misrepresentation to the Court." *Id*.  "Loss of such an 'opportunity' is not cognizable prejudice." *Id*.; *cf. Davis v. Adm'r New Jersey State Prison*, 795 F. App'x 100, 102–03 (3d Cir. 2019) ("The notion that a defendant can enter a plea of guilty, while maintaining his innocence, is foreign to our state jurisprudence" and "Court-sanctioned perjury is not a permissible basis for the entry of a plea in [New Jersey]." (alterations removed) (quoting *State v. Taccetta*, 975 A.2d 928, 935 (2009)).

That said, continuing to assert one's innocence does not automatically "preclude a showing of prejudice," but the "fact that Petitioner maintained his innocence in sworn testimony before the Court weighs against his assertion that he would have accepted the plea agreement." *Stevenson v. United States*, No. 12-145, 2019 WL 845418, at *25 (M.D. Pa. Feb. 21, 2019); *Battle v. United States*, No. 13-2024, 2014 WL 1272176, at *2 (D.N.J. Mar. 26, 2014); *Hines v. Ricci*, No. 10-4130, 2014 WL 314430, at *1 (D.N.J. Jan. 8, 2014).

In such cases, courts have found that the alleged prejudice is "far too speculative," as the claim that a petitioner "would have accepted a plea deal is belied by the fact that [he] maintained [his] innocence through the completion of . . . trial and sentencing." *Donna v. United States*, No. 10-1607, 2011 WL 322636, at *7 (D.N.J. Jan. 31, 2011) (citing *United States v. Gonzalez–Rivera*, 217 F. App'x 166, 169–70 (3d Cir. 2007); *United States v. Jackson*, No. 09–5255, 2010 WL 1688543, at *3–4 (E.D. Pa. Apr. 27, 2010)).

In the present case, not only did Petitioner forcefully maintain his innocence at trial, but he also maintained his innocence throughout these § 2255 proceedings.  During the evidentiary hearing, the Court was able to observe Petitioner when the Government cross-examined him

regarding his innocence, and Petitioner's demeanor was decidedly evasive. (ECF No. 34, at 57:19 to 66:25.)  Petitioner's responses were inconsistent and as the hearing went on, increasingly dubious, as Petitioner appeared to realize that his earlier allegations of innocence undermined his claim that he would have otherwise pleaded guilty. (*Id*. at 63:18 to 66:25.)

Eventually, he sought to distance himself from his own allegations, claiming that he did not write, and implying that he did not understand or adopt his own § 2255 Motion—contrary to his declarations under penalty of perjury. (*Id*. at 60:18–24, 63:25 to 64:2)  At no point during the hearing did Petitioner state that he was guilty of any conspiracy or otherwise accepted responsibility for any conspiracy.  Indeed, when asked directly, "[s]o . . . you never joined the conspiracy to distribute the methamphetamine, right?"  Petitioner responded, "I mean, I don't know how that works. I can't answer that." (*Id*. at 65:19 to 66:1.)  The Court finds that Petitioner's evasive demeanor, inconsistent responses, and dubious answers, all weigh against his credibility.

Ultimately, Petitioner asks the Court to either: (1) ignore that he committed perjury throughout his § 2255 filings, and that the Court should allow him to plead guilty pursuant to the plea offer; or (2) ignore that he was truthful regarding his innocence, and that the Court should now allow him to commit perjury and enter an *untruthful* plea of guilty pursuant to the plea offer. Accordingly, Petitioner's earlier protestations of innocence also weigh strongly against his credibility and the notion that he would have accepted the plea offer had he received proper advice.

Next, the Court observes that at the time of the plea offer, the sentencing Guidelines assigned a base offense level of 34 to the amount of methamphetamine involved in this case, which was at least 1.5 kilograms but less than 5 kilograms. (ECF No. 13-2, at 7–8.)  There was, however, a proposed amendment to the Guidelines which would have reduced the base offense level for the offense by two levels, to 32. (*Id*. at 8.)  Due to the proposed change, "the Government did not

oppose a downward variance of 2 levels so that Rodriguez's base offense level would be 32." (*Id.*; ECF No. 13, at 9 n.3.)

Consequently, after a three-point reduction for acceptance of responsibility, the parties stipulated that Petitioner had either: "(1) a base offense level of 29 (exposing him to a Guidelines sentence of 87–108 months); or (2) if the Court did not grant the unopposed 2-level downward variance, a base offense level of 31 (exposing him to 108–135 months)." (ECF No. 13, at 9 n.3.) In contrast, at trial, Petitioner faced a mandatory minimum sentence of 120 months, and his applicable Guidelines range would have been 151–188 before the proposed amendment, and 121–151 months, if the United States Sentencing Commission adopted the proposed amendment.

Had trial counsel given Petitioner proper advice, Petitioner would have understood that the Court was not required to accept the downward variance.  Trial counsel should have advised Petitioner of that potential scenario, in which "even if you take this deal, the best you can hope for, if it's a 31, is" nine years under the plea offer, and ten years, at best, at trial. (ECF No. 34, 35:6 to 36:4.)  Of course, such advice would have also entailed advising Petitioner that if "he had a 31," that "he could have gotten more than ten," and that the Court could have given "him up to 135 [months] . . . even with [the] plea" offer. (*Id.* at 36:9–19.)

Indeed, as trial counsel conceded, "it's not a huge window.  I mean, it's not -- we're not talking about the difference between a ten and a five or a four or something like that[,] that is such a great difference that you have the kind of concerns . . . that you might otherwise have." (*Id.* at 36:4–8.)  Accordingly, the Court finds that the relatively small differences between those four potential outcomes weighs slightly against the notion that Petitioner would have accepted the plea offer had he received proper advice.  Finally, the Court notes that throughout the evidentiary hearing, trial counsel consistently recalled advising Petitioner that he had a fifty/fifty chance of

17

winning at trial. (*Id*. at 30:21; 14:22–14.)  The Court concludes that this advice, combined with Petitioner's strong protestations of innocence, weigh against the notion that Petitioner would have accepted the plea offer.

For all those reasons, the Court finds that Petitioner's allegations that he would have accepted the plea offer are not credible.  As a result, Petitioner has failed to meet his burden to demonstrate that he would have taken the plea offer, had he received proper advice regarding his sentencing exposure.  Accordingly, Plaintiff has failed to establish prejudice under *Strickland*, and the Court will deny this claim.

### b.   Ineffective Assistance of Counsel for Relying on an Alibi Defense, Rather Than Obtain an Expert Chemist's Report.

Next, Petitioner contends that trial counsel was ineffective for relying on an alibi defense, instead of obtaining an expert chemist's report that would have allegedly provided exculpatory evidence.  At the outset, Petitioner fails to explain why he believes pursuing an alibi defense was deficient. (ECF No. 1-2, at 25–27; ECF No. 15, at 9–15.)  He appears to summarily conclude that an alibi defense was deficient, and then alleges that a chemist's report would have been preferable. (ECF. No. 1-2, at 25–27; ECF No. 15, at 9–15.)  Petitioner contends that the Government's evidence "unintentionally created a window" of only approximately 90 minutes in which he "could have been with Joel cooking meth on April 18, 2012." (ECF No. 1-2, at 26.)  After his conviction, Petitioner obtained an expert chemist's report that showed that it would have taken "10–24 hours" to complete the cooking process. (*Id*.)

The Court finds that relying at least in part on an alibi defense was reasonable trial strategy as:

> The proof at trial established that Rodriguez was present during two events relating to the conspiracy: first, the sale of the

> methamphetamine from Santos to Joel and Kate, which took place
> at Santos's house the evening of April 17, 2012, and second, the
> meeting between Joel and Rodriguez on April 18, 2012, during
> which they diluted the methamphetamine purchased the previous
> day.

*Rodriguez*, 726 F. App'x at 139.  In response, Petitioner "presented two witnesses, his mother[,] and the mother of his child, who each testified that he was with the two [of] them at the Rodriguez family home from the evening of April 17 through approximately 2:00 p.m. on the afternoon of April 18, 2012." *Id*.  If the jury believed Petitioner's alibi, they would have concluded that Petitioner was not physically present during the sale or during the time that Joel diluted the methamphetamine.  In other words, the alibi defense could have persuaded the jury to avoid a more damning conclusion, *i.e.*, that Petitioner was physically present during the drug sale and the dilution process.  Accordingly, as Petitioner has failed to rebut the presumption that relying on an alibi defense was a reasonable trial strategy, he has failed to establish that counsel was deficient under *Strickland*.

Petitioner's true argument appears to be that counsel was ineffective for failing to obtain an expert chemist's report *in addition* to pursuing an alibi defense.  Even without the report, however, trial counsel vigorously cross-examined Joel, attacking the notion that Joel would give Petitioner, "a guy that [he] never met before," a hundred thousand dollars in cash, to purchase methamphetamine without Joel. (ECF No. 135-5, at 192–203.)  Counsel also challenged Joel's allegation that Petitioner had the time to go out, buy chemicals, divide the methamphetamine "into five packages, put[] additive into it, cook[] it up and then put[] it on dry ice," within the Government's narrow timeline. (*Id*. at 192–94.)  Additionally, counsel was able to cross examine the Government's chemist, and raised the possibility that it would take longer than 90 minutes for Petitioner and Joel to cook the methamphetamine. (ECF No. 135–6, at 69:9 to 71:8.)

19

Consequently, it was a reasonable trial strategy for counsel to argue that the timing under the Government's version of the events was dubious and focus on discrediting the Government's expert and Joel, rather than retain a defense expert.

In any event, more critically, the defense report would have only rebutted the Government's evidence that on April 18, 2012, the day after the deal was consummated, Petitioner helped Joel dilute the methamphetamine. The flaw in Petitioner's argument is that the jury did not need to find that he helped dilute the methamphetamine on April 18, 2012, in order to find him guilty of the charged offense. As the Third Circuit explained, "the Government was not required to prove Rodriguez's presence at any particular place in order to establish the elements of conspiracy." *Rodriguez*, 726 F. App'x at 139. Rather, "[i]n order to meet its burden of proof for the charged conspiracy, the Government needed to establish '(1) a shared unity of purpose between the alleged conspirators, (2) an intent to achieve a common goal, and (3) an agreement to work together toward that goal.'" *Id.* at 141 (quoting *United States v. Bailey*, 840 F.3d 99, 108 (3d Cir. 2016)). Consequently, "the Government was not required to prove the commission of any overt acts in furtherance of [a] conspiracy to distribute drugs in violation of 21 U.S.C. § 846. *Id.* (internal quotation marks omitted).

As a result, even if the jury had believed Petitioner's alibi, or accepted his report's conclusion that there was insufficient time for Petitioner to dilute the methamphetamine on April 18, 2012, they "would only serve to demonstrate that he did not [physically] participate in the April 17, 2012[,] sale or the April 18, 2012[,] meeting to dilute the drugs, but would not entitle him to acquittal on the conspiracy charge." *Id.*

Such evidence would not have resulted in an acquittal because "the Government also produced evidence of Rodriguez's involvement in the conspiracy beyond those events." *Id.* Among other things, the Government presented:

> testimony by Santos and Kate that Rodriguez had communicated on multiple occasions with each of them to arrange the sale. The Government also produced evidence that Rodriguez was in regular cell phone contact with the other members of the conspiracy on the day of the sale, with the exception of an hour-long gap from 9:53 to 10:58 p.m. Finally, the Government also presented evidence that Rodriguez was involved with the conspiracy after April 18, 2012, including testimony by Santos that he met with Rodriguez to warn him after the DEA searched Santos's neighbor's house and evidence that Rodriguez called Joel and Kate twenty-two times in rapid succession the evening they were arrested with the drugs.

*Id.* Consequently, assuming *arguendo* that the jury believed the defense report and found that Petitioner had not personally participated in diluting the methamphetamine, the report would have had no effect on the wealth of other evidence that Petitioner participated in the conspiracy.

In other words, even without personally diluting the methamphetamine:

> There was sufficient evidence for the jury to conclude that Rodriguez, Santos, Joel, Kate, and Crespo were all members of a single conspiracy because they shared a common goal and were dependent upon each other's continuous cooperation for the success of the undertaking. It is clear that the conspirators, including Rodriguez, had a common goal to conduct a transaction involving the sale of four pounds of methamphetamine from Santos to Joel, Kate, and Crespo . . . . Santos was aware before the transaction that Rodriguez was acting as a middleman, arranging for buyers of his product, and Kate was aware in advance that Rodriguez was arranging for the purchase of the methamphetamine from another individual. It is also clear that the success of this venture was dependent upon the continuous cooperation of all the parties charged in the indictment: Santos only sought to obtain the drugs because Rodriguez knew that Kate, Joel, and Crespo were interested buyers, and the buyers' scheme to profit from the resale of the drugs could not have succeeded had Santos been unable to provide them. This cooperation culminated in the sale Rodriguez orchestrated on the evening of April 17, 2012, when Joel and Kate, using money provided by Crespo, purchased the methamphetamine from Santos.

*Id.* at 143.

Petitioner appears to believe that without his participation in diluting the drugs on April 18, 2012, he was only a "broker," and that "Joel, Kate, and Crespo's purchase of the drugs from Santos [did] not amount to a drug distribution conspiracy" because they were simple buyers, and Santos was a simple seller. *Id.* (citing *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999)) (explaining that under *Gibbs* "simple buyer-seller relationship[s]," without more, are insufficient to amount to a conspiracy to distribute drugs).  Like the Third Circuit, this Court rejects that theory as the evidence at trial demonstrated that the: "April 17, 2012[,] transaction was the result of extensive dealings among the parties that were conducted through Rodriguez" and that his "role as the orchestrator of and conduit between the parties to the transaction [was] sufficient to distinguish this case from that of a 'simple buyer-seller' interaction." *Id*.

For all those reasons, Petitioner has failed to show that counsel was deficient for relying on an alibi defense or that obtaining a chemist's report would have resulted in a different outcome at trial.  *Strickland*, 466 U.S. at 694.  Accordingly, as Petitioner has failed to establish either prong of *Strickand*, the Court will deny this claim.

## IV.     CERTIFICATE OF APPEALABILITY

The Court must assess whether a certificate of appealability should issue. A litigant may not appeal from a final order in a proceeding under 28 U.S.C. § 2255 without a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B).  A certificate of appealability shall not issue unless there is a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*,

529 U.S. 473, 484 (2000)).  Based on the discussion above and the Court's factual findings after an evidentiary hearing, reasonable jurists would not find it debatable that Petitioner's claims lack merit.  Consequently, the Court will not issue a certificate of appealability.

## V.  CONCLUSION

For the foregoing reasons, the Court will deny Petitioner's § 2255 Motion.  A certificate of appealability shall not issue.  An appropriate Order follows.


DATED:  2 November 2022                              s/ Robert B. Kugler
                                                    ROBERT B. KUGLER
                                                    United States District Judge